KAREN A. OVERSTREET
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Rm. 6301
Seattle, WA 98101-1271
(206) 370-5330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| In re | ) | Chapter 13 |
| DIANE EVANS, | ) | Bankruptcy No. 04-12661 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | Chapter 13 |
| In re | ) | Bankruptcy No. 03-24162 |
| REBECCA I. VALDIVIA, | ) | |
| | ) | **MEMORANDUM DECISION** |
| | ) | **ON STUDENT LOANS AND** |
| Debtor. | ) | **COLLECTION CHARGES** |
| _____ | ) | |

In these cases, the debtors challenge proofs of claim filed by Educational Credit Management Corporation ("ECMC") for student loan debt. In particular, the debtors have challenged ECMC's inclusion of collection costs in the claims, contending that the collection costs are unreasonable and that they constitute postpetition claims not allowable in their bankruptcy cases. Rebecca Valdivia also contends that her loans are eligible for rehabilitation, and that on that basis, any collection costs that are allowable against her must be limited to 18.5%. For the following reasons, the Court will deny the debtors' objections to the collection charges, but the Court agrees that in the case of Ms. Valdivia, those charges may be limited to 18.5%.

MEMORANDUM DECISION - 1

# I. PROCEDURAL BACKGROUND

The debtors' objections to ECMC's claims initially came before the Court for hearing on September 15, 2005. At that time, it became clear that both debtors were making the same challenge to the collection costs imposed by ECMC on their unpaid educational loan debts. For efficiency, the Court set an evidentiary hearing on both cases for the same date so that three remaining issues could be determined: (i) whether ECMC's imposition of collection charges constitutes an improper postpetition collection activity; (ii) whether the collection charges assessed violate the terms of the debtors' student loan notes; and (iii) whether the amounts sought are otherwise unenforceable against the debtors under Bankruptcy Code § 502(b)(1).[1] Separately, Ms. Valdivia claimed that she was entitled to reinstatement of her loans.

On December 16, 2004, the Court held an evidentiary hearing in both cases. The sole witness for ECMC was Daniel Fisher, a managing attorney for ECMC. Mr. Fisher testified concerning the background of the student loan program and the process by which ECMC and other student loan agencies assess collection charges on defaulted student loans. Counsel for Ms. Evans and Ms. Valdivia cross examined Mr. Fisher. Ms. Valdivia, the only other witness, testified concerning her student loan and payment history. At the conclusion of the hearing, the Court requested additional

---

[1] Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ *101 seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

MEMORANDUM DECISION - 2

legislative history from ECMC.  By letter dated December 21, 2004, counsel for ECMC provided the Court with additional references to the legislative history to the relevant federal statutes and regulations.  In addition, counsel for ECMC advised the Court of a decision by a United States District Court in the Southern District of Indiana, addressing issues identical to those under consideration in these cases.  That decision, *Educational Credit Management Corp. v. Barnes*, 318 B.R. 482 (S.D. Ind. 2004), was issued on December 15, 2004.   Counsel for ECMC also attached to his December 21, 2004 letter a copy of the deposition transcript of Pamela Moran, dated July 12, 2001, which was taken in the *Barnes* case.  The Court has not considered that deposition, however, as it was not provided to the Court and the debtors prior to the evidentiary hearing on December 16, 2004. The Court then took the matter under advisement.

## II.  FACTUAL BACKGROUND

A.  <u>Diane Evans Case</u>.

In the fall of 1993, Ms. Evans consolidated her existing student loans to create the single student loan at issue here (the "Evans Loan").  The total amount of the consolidated loan was $14,800.54 with interest at 9% per annum.  The Evans Loan was initially held by the Student Loan Finance Association ("Sallie Fae") and was serviced by Academic Financial Services Association ("AFSA").  After the loans were consolidated, but before the consolidated loan went into default, Ms. Evans made payments totaling $455.  All of these payments were applied to interest.

After a period of forbearance, Ms. Evans defaulted on the

MEMORANDUM DECISION - 3

loan. On January 5, 1996, Northwest Educational Loan Association ("NELA") paid a claim to Sallie Fae/AFSA in the amount of $15,865.43, and that amount then became the starting principal balance of the defaulted loan. Accrued and unpaid interest was capitalized as a result of the default and subsequent payment by the student loan guarantor.

From 1996 to the petition date in this case, Ms. Evans made payments totaling $6,063.78. Of that amount, $5,432.36 was applied to interest and $631.42 was applied to collection costs. The payments, however, were never large enough or made frequently enough to result in any reduction to the principal balance of the loan. Exhibit 11 shows the payment history on the Evans Loan. NELA held the Evans Loan from January 5, 1996, the date of the default, through approximately August 22, 2003, when the Department of Education ("DOE") was subrogated to the rights of NELA. Ms. Evans' last payment on the loan was April 11, 2002, and that was a payment that resulted from a garnishment.

On March 1, 2004, Ms. Evans filed her Chapter 13 case. DOE held the Evans Loan as of the petition date, then assigned the loan to ECMC on April 14, 2004. ECMC timely filed a proof of claim for the amount owed on the Evans Loan as of the petition date. Ms. Evans filed a partial objection to the claim, asserting that the claim is overstated by the amount of the collection costs. The proof of claim states that the total balance as of the petition date was $27,592.09, consisting of $15,865.43 in principal, $6,209.02 in interest, and $5,517.84 in collection costs. The collection costs represent 34.77% of the

MEMORANDUM DECISION - 4

principal balance and 25% of the amount of principal plus interest.

B.   Rebecca Valdivia Case.

On June 15, 1996, Ms. Valdivia's student loans, which had a cumulative principal balance of approximately $21,501 (the "Valdivia Loans"), entered repayment.  The actual interest rates charged on each of the individual loans varied from year to year, but averaged approximately 7.5% during the entire life of the loans.  Between June 15, 1996 and October 28, 1996, Ms. Valdivia applied for, and obtained, a forbearance on her loans, temporarily allowing her to forbear repayment, but not terminating the accrual of interest.  At the end of the forbearance period, accrued interest in the total amount of approximately $1,469 was capitalized, raising the principal amount of the loan to $22,970.

On November 29, 1996, Ms. Valdivia made her first payment on her student loans in the amount of $296.  Only a small amount of this $296 payment was applied to principal.  The vast majority of the payment was applied to interest.  During the life of the loans, this was the only payment large enough to permit any paydown of principal.  Between November 29, 1996 and July 1, 1997, Ms. Valdivia made no further payments on her loans, and the loans went into default.

On August 1, 1997, NELA (the guarantor on the Valdivia Loans) paid the claims to Sallie Mae.  Because the loans were in default at the time, accrued interest was capitalized, resulting in a new principal balance of $23,836.  In addition, collection

MEMORANDUM DECISION - 5

costs were applied to the Valdivia Loans at the same time.

On or about October 18, 2000, NELA advised Ms. Valdivia of her right to rehabilitate the defaulted loans by making twelve consecutive monthly payments. Ex. 18. Ms. Valdivia agreed to make monthly payments of $250, commencing on October 28, 2000. The payments were set up to be automatically deducted from her checking account. The history of her payments is shown in Exhibit 7. At the conclusion of the twelve months of payments, Ms. Valdivia contacted NELA to determine what she needed to do next to rehabilitate her loans. She was told that she should have contacted NELA before the payments were completed, and that she would therefore have to make an additional twelve months of consecutive payments. Ms. Valdivia made another twelve consecutive monthly payments and in September of 2002, received an Acknowledgment of Debt for Rehabilitation of Defaulted Student Loans, Exhibit 19. Exhibit 19 informed Ms. Valdivia that if she signed the acknowledgment her loans would be sold by NELA to another lender and thereby removed from default status. The form further advised her that as a condition of the rehabilitation, she had to agree to the capitalization of all accrued interest and collection costs. The collection costs would be assessed at the rate of 18.5% of total principal and accrued interest. Interest at the note rates would then be charged going forward on the new principal balance. Because she objected to the collection costs that had been assessed, Ms. Valdivia never signed the acknowledgment required in Exhibit 19.

Between July 27, 1998 to October 31, 2003, Ms. Valdivia's

MEMORANDUM DECISION - 6

payments totaled $9,215. Of that amount, approximately $7,635 was applied to interest and $1,573 was applied to collection costs. The payments were never high enough to result in any reduction to the principal balance of the loans.

On October 31, 2003, Ms. Valdivia filed her Chapter 13 petition. As a result of the bankruptcy, NELA assigned the Valdivia Loans to ECMC. Upon the transfer of the loans, ECMC applied its own collection charges. ECMC timely filed two proofs of claim for amounts due under the Valdivia Loans as of the petition date. The total amount of the two claims is $35,162.05, which includes principal of $23,835.01, accrued interest of $4,295.25, and collection charges of $7,031.79. The collection charges represent 29.2% of the outstanding principal and 25% of the amount of principal plus interest.

Ms. Valdivia objected to the claims on the grounds that they were not sufficiently supported, that certain payments had not been properly applied, and that the claims included improper collection charges.

C.  Collection Costs in Both Cases.

ECMC introduced no evidence of any specific collection action taken on either the Evans Loan or the Valdivia Loans by it or by any previous holders of the loans. It did, however, submit evidence of expenses incurred in collection activities in its national defaulted student loan portfolio. Exhibit 3 contains a list of the categories of expenses tracked by ECMC related to collection of defaulted student loans. These expenses, broken out by category, are shown for the twelve months of 2002. For

MEMORANDUM DECISION - 7

that twelve month period, ECMC's total collection expenses were $8,418,986.58.  During the same period, ECMC's cash collections on student loans totaled $34,864,965.21.  According to Exhibit 3 and the testimony of Mr. Fisher, this would yield a collection cost of 24.15% (collection expense as a percentage of total collections), from which it calculates a "make whole" rate of 31.84%.  Mr. Fisher testified that the make whole rate is the rate the industry determines must be charged to the borrower in order for the holder to recover all principal and interest.

Mr. Fisher testified that according to the regulations applicable to student loans, NELA must recalculate the collection costs each year after a loan goes into default.  As to each loan in default, the amount of the previous year's collection cost is removed from the balance of the loan and the newly calculated annual rate is applied.  In addition, if payments are made by the borrower, ECMC applies a percentage collection rate to each payment and shows that amount as a payment to collection costs. For example, if the collection rate is 24.15%, as it was for 2002, then 24.15% of each payment made by a borrower is applied to collection costs, the balance to interest, and then, if the payment is sufficient, to the reduction in the principal balance of the loan.  Pursuant to the regulations, the collection rate must also be recalculated each time the loan is transferred from one entity to another.  So, in the case of the debtors' loans, ECMC is required to remove collection costs assessed by its assignee and to recalculate and reassess those costs at the rate applicable at the time.  A recalculation of the collection cost

MEMORANDUM DECISION - 8

may result in an increase or a decrease of the total collection costs.

### III. DISCUSSION

A. <u>Bankruptcy Code § 502</u>.

Under Section 502(a), a claim is deemed allowed unless a party in interest objects to it. Section 502(b) contains a list of substantive objections that can be the basis for disallowance of a claim. The debtors in these cases challenge ECMC's proofs of claim under Section 502(b)(1), which provides for disallowance of a claim to the extent that:

> [S]uch claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured....

Accordingly, the Court must examine the agreement between the debtors and ECMC, as assignee, and any law applicable to the loans at issue.

The debtors urge the Court to hold that the collection charges are unreasonable because they do not reflect actual collection costs incurred by ECMC in enforcing collection of the debts. ECMC, on the other hand, contends that in determining the enforceability of the collection costs, the Court is bound by the federal laws and regulations governing student loans and not by the typical "reasonableness" standard the Court applies in bankruptcy cases or when examining similar charges under

MEMORANDUM DECISION - 9

Washington state law.[2]

B.   Enforceability Under the Terms of the Notes.

The debtors' student loans are governed by the terms of the promissory notes they signed.  The promissory note that Ms. Evans signed on August 24, 1993, when she consolidated her student loans, is in evidence as Exhibit 15.  With regard to collection costs, her note states:

> If this loan is referred for collection to an agency that is subject to the Fair Debt Collection Practices Act, I will pay those collection costs which do not exceed 25 percent of the unpaid principal and accrued interest.

Ms. Valdivia signed six separate promissory notes.  Ex. 8, Ex. 6.  Each of the notes contains a provision requiring the borrower to pay "reasonable" attorney fees and costs, but there is no percentage limitation on costs like the limitation contained in the Evans note.  In addition, each note signed by Ms. Valdivia provides that it is governed by the Higher Education Act of 1965, as amended, 20 U.S.C. § 1090, *et seq.* (the "HEA").

C.   Enforceability Under Applicable Law.

Student loans are generally made available to students through the Federal Family Education Loan ("FFEL") programs, 34 C.F.R. § 682.1000(a), the Perkins Loan program and other subsidized loan programs.  Under the FFEL programs, which are administered by DOE, loans are made to students by banks and

---

[2] Note that Section 502 contains no specific ground for objection based upon a claim that the fees assessed are not "reasonable."  While the reasonableness of fees is a concept specifically applicable under Section 506(b), that concept is not expressly applicable under Section 502(b)(1).

MEMORANDUM DECISION - 10

other private financial institutions to cover tuition, room and board and other educational expenses. Repayment of FFEL loans is guaranteed by various state and non-profit guaranty agencies. 34 C.F.R. § 682.200. When a student loan borrower defaults, the guaranty agency pays the private lender. To the extent the guaranty agency is unable to collect the total amount of a defaulted student loan, the guaranty agency can make a claim for reinsurance from DOE. The terms of the loans are established by the promissory notes executed by the student loan borrowers as well as federal laws and regulations.

The promissory notes at issue in these cases are governed by the HEA, which provides in 20 U.S.C. § 1091a(b) that:

> (b)  <u>Assessment of costs and other charges</u>
> Notwithstanding any provision of State law to the contrary-
> (1) a borrower who has defaulted on a loan made under this subchapter and part C of subchapter I of chapter 34 of Title 42 shall be required to pay, in addition to other charges specified in this subchapter and part C of subchapter I of chapter 34 of Title 42, *reasonable* collection costs....

20 U.S.C. § 1091a(b)(emphasis added). The statute does not define "reasonable collection costs." Pursuant to its rulemaking authority, DOE has promulgated certain regulations implementing this provision. These regulations include 34 C.F.R. § 30.60 and 34 C.F.R. § 682.410(b)(2) dealing with collection costs and other charges.

Under 34 C.F.R. § 30.60, delinquent student loan borrowers may be charged for costs pursuant to the formula set forth in that regulation. The collection charge assessed by ECMC and

MEMORANDUM DECISION - 11

other guaranty agencies is governed by 34 C.F.R. § 682.410(b)(2), and is limited to the lesser of (i) the amount calculated under 34 C.F.R. § 30.60, and (ii) the amount the same borrower would be charged for the cost of collection if the loan was held by DOE. The uncontroverted testimony at trial was that the debtors would be charged 25% of outstanding principal and interest if their loans were held by DOE and that ECMC's collection charge calculated under 34 C.F.R. § 30.60 would be greater than that amount. Accordingly, ECMC concedes that it is limited to a charge that is not greater than 25% of outstanding principal and interest.[3]

Based upon the evidence, the Court concludes that the collection charges assessed against the debtors are in compliance with the HEA and regulations promulgated thereunder. Consequently, the Court can invalidate the charges only if it finds that the regulations themselves are invalid.

D. The Validity of the DOE Regulations.

Under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), a reviewing court must hold unlawful and set aside agency regulations that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." The arbitrary and capricious standard of review is typically deferential to the agency. It is a narrow standard of

_____

[3] Frankly, the Court does not understand how the rates are actually mathematically calculated under the applicable regulations. Because the debtors have not challenged the calculations, however, other than on reasonableness grounds, the Court will accept ECMC's math.

MEMORANDUM DECISION - 12

review and the court is "not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

In reviewing an agency's regulation, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 31. Circumstances that may give rise to a determination that an agency regulation is arbitrary and capricious include: reliance on factors which Congress did not intend for the agency to consider, failure to consider important aspects of the problem, explanations for the rule that run counter to the evidence, or the rule is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*

To overcome this deferential standard of review, a party challenging a regulation bears a significant burden, especially when the language used in the statute is broad. *See Educational Credit Management Corp. v. Barnes,* 318 B.R. 482, 486-87 (S.D. Ind. 2004).[4] The language at issue in the present case is the "reasonable" standard provided in 20 U.S.C. § 1091a(b) for the assessment of collection costs. This is broad statutory

---

[4] The *Barnes* case dealt with the identical issue in this case: whether the collection costs imposed by ECMC are reasonable. The court engaged in a lengthy analysis of the constitutionality of 34 C.F.R. § 682.410(b)(2), concluding that the regulation is not unconstitutional on its face or as administered by DOE and ECMC in the context of the bankruptcy proceeding at issue there.

MEMORANDUM DECISION - 13

language, so the debtors, who challenge the agency's interpretation in the corresponding regulation, 34 C.F.R. § 682.410(b)(2), bear a significant burden.

Analyzing whether an agency has been arbitrary and capricious requires examining the statute's legislative history and the rule-making process. In *Barnes*, the court reviewed the legislative history and found that Congress intended that "borrowers, not taxpayers, foot the bill for costs associated with the collection of delinquent student loans." *Id.* at 489. In order to implement this goal, the DOE chose to use a cost averaging method and the formula approach set forth in 34 C.F.R. § 30.60, rather than tracking the specific costs associated with collection of a particular loan. *Id.* at 488-89.

The rationale behind the cost averaging method is efficiency. In *In re Schlehr*, 290 B.R. 387, 392 (Bankr. D. Mont. 2003), testimony revealed that the DOE chose the cost averaging method because "it is more efficient for guaranty agencies to assess percentage-based collection costs instead of keeping track of every time they send a letter to a debtor." Further, according to the testimony, "the Secretary of Education has determined that tracking costs of collection of each defaulted loan would create too onerous of a system, that such a level of specificity would be untenable, inefficient, and that such detailed record keeping would result in far higher collection costs for debtors than percentage-based collection costs." *Id.* The *Schlehr* court concluded that "a system which track[ed] individual time and expenses for each case would be onerous and

MEMORANDUM DECISION - 14

result in far higher charges to defaulting student loan debtors."
*Id.* at 398.

As a result of Congress' concerns regarding cost, DOE's consideration of efficiency was a proper concern in the rule-making process. On the other hand, efficiency should not be the only factor that the agency considered. Indeed, the *Barnes* court noted that "care obviously must be given to assure that any disparity between the actual costs of collection and the imposed costs is kept to a minimum so that the benefits of efficiency are not trumped by unfair hardship to some borrowers." 318 B.R. at 488. The court concluded that it had "no basis for concluding that the agency did not achieve such a proper balance." *Id*.

The arbitrary and capricious standard provides for review of agency regulations. It does not provide for review of the application of the regulation to a particular individual. In *In re Brown*, 310 B.R. 341 (Bankr. N.D. Ohio 2004), the court considered the fairness of the application of the regulation to individuals. In that case, the court was troubled by the fact that the collection costs appeared large in proportion to the underlying debt. *Id*. at 345. The collection costs in question ranged from $496.66 to $1572.78 for total student loan claims inclusive of collection costs ranging from $2,525.52 to $6,545.19, respectively. *Id.* at 344. While the court recognized that the collection costs seemed large in proportion to the debt, the court did not find that the costs were "facially unreasonable." *Id.* at 345. Instead, the court rationalized that student loans are risky, are made on an unsecured basis, usually

MEMORANDUM DECISION - 15

without regard to credit history, leaving the creditor with only the potential future earning ability of the debtor to repay the debt. *Id.*

In this case, the testimony was not that no collection activities had been undertaken as to any of the debtors' student loans; the testimony was that no holder of the loans made any attempt to track those collection activities or the cost of those activities. All of the loans were in default for a significant period of time prior to bankruptcy. Guaranty agencies are required to engage in certain mandatory collection action within the time frames set forth in 34 C.F.R. § 682.410(b)(6). These activities include sending the borrower written notices and commencing wage garnishments. Under the regulation, for a non-paying borrower, an agency must engage in one collection activity every 180 days.

The 25% collection fees assessed in these cases do not exceed amounts permitted under the applicable promissory notes. In fact, Ms. Evans' note clearly states that she could be required to pay as much as 25% of the unpaid principal and interest on the loan in the event of a default. The Valdivia notes do not contain any limit on the amount of collection charges.

The Court finds persuasive the reasoning employed in the *Barnes* decision, and for the reasons stated therein and in this ruling, the Court concludes that the DOE's interpretation of "reasonable" collection costs is itself reasonable and that the assessment of those costs under the circumstances of these cases

MEMORANDUM DECISION - 16

does not afford a basis for disallowance of those costs under Bankruptcy Code § 502(b)(1).

E.   The Timing of the Imposition of Collection Costs.

The debtors contend that the collection costs at issue were assessed by ECMC after the petition was filed, making the costs postpetition claims not subject to allowance and payment through their Chapter 13 plans.  The question is answered by Bankruptcy Code § 101(5), which defines a "claim" entitled to payment from the estate broadly as follows:

> (5) "claim" means-
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Under 20 U.S.C. § 1091a(b)(1), a student loan borrower becomes liable for collection costs pursuant to that statute and the regulations discussed above as soon as the borrower defaults. Under the regulatory scheme, every holder of the defaulted loan has a right to assess and recover collection charges pursuant to 34 C.F.R. § 30.60 and 34 C.F.R. § 682.410(b)(2).  Under these regulations, as confirmed by Mr. Fisher's testimony, the collection charges must be recalculated every time the loan is transferred from one agency to another.  At the time of a transfer, the new assignee must remove any collection costs assessed by the prior holder and assess its own collection costs

MEMORANDUM DECISION - 17

1  pursuant to the statute.

2      In this case, Exhibit 14 shows that $5,324 in collection

3  costs had been assessed against Ms. Evans prior to the transfer

4  of her loan to ECMC.  Postpetition, ECMC recalculated that charge

5  according to the regulations and applied the amount that is now

6  at issue.  Similarly, collection costs had been assessed

7  prepetition against Ms. Valdivia, and those costs were

8  recalculated postpetition by ECMC and added to the proof of claim

9  against her.  Mr. Fisher testified that costs assessed against

10 both debtors do not include any charges for postpetition

11 collection activities.

12     This Court concludes that the collection costs are

13 prepetition claims against the debtors.  These costs were neither

14 unmatured nor contingent as of the petition date.  They were due

15 and payable as of the default dates on the loans, which occurred

16 prepetition.  ECMC's calculation of those costs as a matter of

17 preparation of its claims was not an assessment of a postpetition

18 claim; it was merely a calculation of what the debtors owed as of

19 the petition date.  Consequently, the Court also finds no

20 violation of the stay by ECMC.

21 F.   <u>Ms. Valdivia's Right to Rehabilitation of her Loans</u>.

22     Ms. Valdivia claims that she was denied her right to

23 rehabilitation of her loans under 20 U.S.C. § 1078-6.  The

24 rehabilitation provisions of that statute are implemented by

25 34 C.F.R. § 682.405.  Under that regulation, a borrower in

26 default may rehabilitate the loan by making 12 consecutive

27 monthly payments in an amount set pursuant to

28 MEMORANDUM DECISION - 18

34 C.F.R. § 682.405(b)(1). Each payment must be received "within 15 days of the scheduled due date for 12 consecutive months." 34 C.F.R. § 682.405(a)(2). If those payments are made, the borrower is then eligible to have the loan returned to non-default status, is eligible for additional benefits under the applicable student loan program, and most importantly, the "collection costs may not exceed 18.5 percent of the unpaid principal and accrued interest" on the loan at the time it is sold to an eligible lender. 34 C.F.R. § 682.405(b)(1)(iv). The guaranty agency must provide the borrower with the opportunity to object to the terms of the rehabilitation agreement. 34 C.F.R. § 682.405(b)(1)(v).

In October 2000, Ms. Valdivia negotiated for a rehabilitation of her student loans, then in default. *See* Ex. 18. She was to commence making 12 consecutive monthly payments of $250 on October 28, 2000. Her first payment was made on November 1, 2000, well within the required 15 days of the due date. She testified that at that time, she set up an automatic deduction from her checking account for the required payments, and to her knowledge, all payments were paid on time. The payment history submitted by ECMC, Exhibit 7, shows that Ms. Valdivia made 12 consecutive payments from October, 2000 through September, 2001. At that point, she should have been eligible for rehabilitation. Mr. Fisher had no personal knowledge of Ms. Valdivia's payment history, but believed that she was not eligible for rehabilitation because she failed to make the October 28, 2001 payment according to Exhibit 7. That

MEMORANDUM DECISION - 19

would have been the 13th consecutive payment, however, so that would not justify denying her rehabilitation after her September 2001 payment.

Rather than contest NELA's determination, Ms. Valdivia recommenced making a second round of monthly payments of $250 beginning in December 2001 and continuing for a 12 month period. According to her testimony, these payments were also made by automatic withdrawal from her account and she believed that they had all been paid on time. Her payment history, however, indicates potential problems with the May and July 2002 payments. *See* Ex. 7. The payment history indicates a crediting of a payment in each of those months, then the cancellation of the same amount.[5] Evidence that her payments were all made properly, however, is supplied by Exhibit 19, which Ms. Valdivia received on or around September 26, 2002, and which acknowledged her right to rehabilitation of the loans. Ms. Valdivia testified that when she received this, she called NELA to object to the collection charges that were included in the rehabilitated loans. She believed that the collection charges had been calculated incorrectly. She never signed the Acknowledgment because she never received a satisfactory response to her objection to the charges. It appears that she continued making some $250 per month payments after September of 2002 until the month of the

---

[5] Mr. Fisher had no direct knowledge of the payment history so could not explain the notations in Exhibit 7, except to speculate that perhaps these represented bad checks. That would not explain the notations, however, if Ms. Valdivia's payments were being made through automatic deductions from her checking account.

MEMORANDUM DECISION - 20

bankruptcy filing. *See* Ex. 7.

Based upon the evidence, the Court concludes that Ms. Valdivia's loans should have been eligible for rehabilitation as of September 2001. ECMC, as the assignee of the Valdivia Loans from NELA, has the burden of proving she was not eligible, and ECMC has not met that burden. Accordingly, the Court will require that Ms. Valdivia be given the option to treat the loans as eligible for rehabilitation as of October 2001. If she agrees to rehabilitation as of that date, then the collection costs assessed against her may not exceed 18.5% of the principal and interest outstanding as of October 1, 2001.[6]

**CONCLUSION**

Accordingly, the Court will enter an order denying the debtors' objections to ECMC's claims in these cases, except that Ms. Valdivia will be deemed eligible for rehabilitation under 34 C.F.R. § 682.405 as of the petition date in her case; and if she elects to rehabilitate her loans, ECMC's proof of claim must be amended to reflect the new terms.

DATED this 21ST day of March, 2005.



_____
KAREN A. OVERSTREET
UNITED STATES BANKRUPTCY JUDGE

---

[6] The Court notes that it is difficult to determine whether Ms. Valdivia will actually be better off if the loans are treated as rehabilitated, because the regulations permit the collection fees to be capitalized; and going forward, the new principal balances, including the collection costs, will bear interest. In the absence of rehabilitation, according to the testimony of Mr. Fisher, although interest on a defaulted loan may be capitalized annually, ECMC would not be able to capitalize the 25% collection costs. The Court will leave it to counsel for Ms. Valdivia to do the math.

MEMORANDUM DECISION - 21